UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                                        16-cr-775 (PKC)

      -against-

                                                      OPINION AND ORDER

ANGEL CAMILO,

                        Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.:

        Defendant Angel Camilo, who is proceeding on his own behalf, moves pursuant to 18 U.S.C. § 3582(c) and Section 401 of the First Step Act of 2018 (the "Act"), Pub. L. No. 115-391, 132 Stat. 5220, for a reduction of his sentence. (Doc 114 ("Camilo Br.").) Camilo, who has been convicted for conspiracy to distribute and possess with intent to distribute heroin and cocaine (Judgment at 1), has served approximately 71 months of a sentence of principally 102 months of imprisonment (Judgment at 2) and is currently projected to be released in December 25, 2023 (Govt Br. at 2).[1] His original sentence was 19 months below the bottom of the advisory guideline range. For the reasons explained below, the Court concludes that Camilo has failed to establish extraordinary and compelling reasons for a sentence reduction and that the factors enumerated under 18 U.S.C. § 3553(a) also counsel against a sentence reduction here. Camilo's motion will be denied.

BACKGROUND

        On the morning of September 26, 2016, at approximately 8:30 a.m., Onofre Fear and Edmundo Aispuro—Camilo's co-defendants—arrived in front of Camilo's apartment

---

[1] See also Federal Bureau of Prisons, Inmate Locator, Register Number: 78140-054, https://www.bop.gov/inmateloc/ (last visited Sept. 6, 2022).

building in a black Jeep. (PSR ¶¶ 9-10.) After approximately thirty minutes, Fear, Aispuro and Camilo all approached the rear of the black Jeep, where Camilo removed a large black luggage and rolled it across the street into a black Nissan Altima, with its engine running and with Camilo's wife, Auradel Negrin, in the driver's seat. (PSR ¶¶ 11-12.) Law enforcement officers then approached Camilo and Negrin around the black Nissan Altima and approached Fear and Aispuro around the black Jeep and seized the luggage. (PSR ¶ 13.) Approximately twenty minutes after law enforcement seized the luggage, a trained drug dog indicated a positive alert for the presence of controlled substances. Pursuant to a judicially authorized search warrant for the luggage, law enforcement searched the luggage and recovered approximately forty brick-sized packages that appeared similar in size and weight, which weighed a total of approximately 50 kilograms. (PSR ¶ 14.) After subsequent testing, the luggage was found to contain 26 kilograms of heroin and 14 kilograms of cocaine. (PSR ¶¶ 4(b), 21.) On July 6, 2017, Camilo pleaded guilty to conspiring to distribute and possess with intent to distribute 1 kilogram and more of heroin and 5 kilograms and more of cocaine in violation of 21 U.S.C. § 841(b)(1)(A). (PSR ¶ 2.)

On July 17, 2018, the Court sentenced Camilo principally to a term of 102 months of imprisonment, 19 months below the bottom of the advisory guideline range. (Judgment at 2.) In sentencing Camilo, the Court noted the following. First, the Court commented that Camilo is "a bright man with very strong interpersonal skills," which helped him "pull [ ] off" the instant offense. (Tr. 27.) Second, the Court discussed Camilo's "suffering from major depressive disorder." (Id.) Third, the Court considered the PSR's finding that Camilo "was reared under middle class socioeconomic conditions and was provided all of the basic necessities needed for a proper upbringing [and] disclaimed any significant family issues or any issues of abuse during

his childhood." (Tr. 28.)  Fourth, the Court reviewed Camilo's 2004 arrest and subsequent conviction for a criminal sale of a controlled substance, after which he was not immediately deported from the United States despite his eligibility because "a chance was taken on Mr. Camilo" by "the immigration authorities."  (Id.)  Fifth, the Court scrutinized Camilo's decision to engage in the instant narcotics trafficking involving a "$3 million/26-killogram heroin/14-kilogram cocaine transaction" despite this second chance at remaining in the United States.  (Tr. 29-30.)  Sixth, the Court emphasized the need to deter not only Camilo himself from criminal conduct but also members of the public from engaging in similar criminal conduct.  (Tr. 30.)  Seventh, the Court predicted that if Camilo "will certainly be deported from the United States and barred from reentering . . . . [T]hen there isn't that need to protect the public from further crimes of this defendant."  (Id.)

DISCUSSION

    A.    <u>Applicable Law</u>

"18 U.S.C. § 3582(c)(1)(A), the compassionate release provision, permits a defendant to move for a reduction in sentence, up to and including release from prison, in federal district court after satisfying a statutory exhaustion requirement not at issue here."  <u>United States v. Jones</u>, 17 F.4th 371, 373-74 (2d Cir. 2021).

"Before it can reduce a term of imprisonment or release a defendant under § 3582(c)(1)(A), a district court must 'find[ ] that . . . extraordinary and compelling reasons warrant such a reduction.'"  <u>Id.</u> at 374 (quoting 18 U.S.C. § 3582(c)(1)(A)(i)).  "A court deciding a compassionate release motion can consider 'the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it].'"  <u>United States v. Keitt</u>, 21 F.4th 67, 71 (2d Cir. 2021) (quoting <u>United States v. Brooker</u>, 976 F.3d 228, 237 (2d Cir. 2020)).  "The

3

only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" Brooker, 976 F.3d at 238 (emphasis in original) (quoting 28 U.S.C. § 994(t)).[2]

"Even if 'extraordinary and compelling' circumstances exist, however, the court must also consider 'the factors set forth in section 3553(a) to the extent that they are applicable' before it can reduce the defendant's sentence." Jones, 17 F.4th at 374 (quoting 18 U.S.C. § 3582(c)(1)(A)). "[A]lthough § 3582(c)(1)(A) permits a district court to end its analysis if it determines that extraordinary and compelling reasons for granting the motion are absent," the Second Circuit has encouraged district courts to "also analyze[ ] the § 3553(a) factors." Id. As applicable here, section 3553(a) requires a court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a). In other words, to succeed on a motion for sentence reduction, "the inmate must demonstrate that his proffered circumstances are indeed 'extraordinary and compelling' such that, in light of these § 3553(a) factors, a sentence reduction is justified under §

---

[2] Following passage of the First Step Act, a reviewing court is not bound by the current application notes to Section 1B1.13 of the United States Sentencing Guidelines.

3582(c)(1)(A) and would not simply constitute second-guessing of the sentence previously imposed." Keitt, 21 F.4th at 71.

"A district court has broad discretion when considering a motion for compassionate release." United States v. Halvon, 26 F.4th 566, 569 (2d Cir. 2022) (citing Brooker, 976 F.3d at 237). In so considering, it is not "require[d] 'that a particular factor be given determinative or dispositive weight,' even when a motion for compassionate release coincides with a change in circumstances like COVID-19." Id. at 571 (quoting United States v. Verkhoglyad, 516 F.3d 122, 131 (2d Cir. 2008)). See also Jones, 17 F.4th at 375 (rejecting defendant's argument that the district court should have "rebalanced [the § 3553(a)] factors in light of the pandemic").

    B.    Application

        i.    Whether there are extraordinary and compelling reasons for a sentence reduction

As to extraordinary and compelling reasons for a sentence reduction here, Camilo makes four principal arguments. First, Camilo, who is "vaccinated, and also boostered," argues that F.C.I. Ray Brook is a "hot spot" for COVID-19 and that he is "more susceptible to experience serious complications" from COVID-19 "because of his obesity and the fact that he performed his music in bars and lounges that were filled with second hand smoke." (Camilo Br. at 2.) Second, Camilo highlights that incarceration has been unusually and unexpectedly punitive due to the pandemic. (Id. at 3-4.) Third, Camilo submits that he has been treated unfairly as a non-citizen because he is ineligible for many beneficial programs and early release provisions. (Id. at 5.) Fourth, Camilo emphasizes that his "family has been suffering as a result of his incarceration." (Id.)

5

As to Camilo's concerns regarding his exposure to COVID-19, without minimizing the dangers of COVID-19 to incarcerated individuals, the Court notes that Camilo has "been fully vaccinated with the Moderna vaccine." (Govt Br. at 6 (citing to Camilo's medical records and collecting cases holding that COVID-19 vaccination counsels against compassionate release).) Relatedly, while Camilo notes that he is obese, because Camilo is a fully vaccinated 39-year-old—who, at the time of his interview for the pre-sentencing report, "reported that in his opinion, he is in good health" (PSR ¶ 46)—his case diverges significantly from the cases highlighted by the Second Circuit in which the district court relied on risks related to the pandemic as an extraordinary and compelling reason for sentence reduction.[3] Finally, as the government notes, "[a]s of May 6, 2022, FCI Ray Brook has no inmates with confirmed active cases of COVID-19 and four active cases for staff," which "illustrates that the BOP has effectively mitigated Camilo's risk of exposure." (Govt. Br. at 6.)

As to Camilo's second argument that conditions of imprisonment have been unusually harsh during the pandemic, Camilo submits that he: (1) has not seen his daughter since the pandemic started because visits and programming have been terminated; (2) was once moved into a cell with two other prisoners whose cellmates had just tested positive for the virus; (3) has difficulty obtaining necessary medications when he needs them (although he does not specify what he needs and what difficulty was presented); (4) is forced to go a long time without fresh air or sunshine; and (5) is supposed to be in a "low-custody facility but the pandemic has messed

---

[3] See Brooker, 976 F.3d at 238 (citing United States v. Zukerman, 451 F. Supp. 3d 329 (S.D.N.Y. 2020) (compassionate release granted for an inmate who was "75 years old and suffer[ed] from diabetes, hypertension and obesity" and was in the "highest risk category for complications and death from the disease if infected."); United States v. Colvin, 451 F. Supp. 3d 237 (D. Conn. 2020) (compassionate release granted for an inmate who had diabetes, "which substantially increase[d] her risk of severe illness if she contract[ed] COVID-19"); United States v. Rodriguez, 451 F. Supp. 3d 392 (E.D. Pa. 2020) (compassionate release granted for an inmate who had "Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease," and was thus "at a higher risk of morbidity and mortality")).

that up" and instead "is around a bunch of harsher criminals, with bigger sentences, and more serious charges.  His safety is always in jeopardy."  (Tr. 4.)

Conditions of incarceration or pre-sentence detention may become so arduous that they merit consideration in measuring the just sentence. See, e.g., United States v. Ciprian, 11 Cr. 1032-74 (PAE), 2021 U.S. Dist. LEXIS 18698, at *8 (S.D.N.Y. Feb. 1, 2021).  But courts have also found that "harsh conditions of imprisonment occasioned by the COVID-19 pandemic are not without more, sufficiently 'extraordinary and compelling' to warrant compassionate release."  United States v. Hatcher, 18 Cr. 454-10 (KPF), 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021).

The Court acknowledges that there is some merit to Camilo's assertion that he has been significantly and negatively impacted by "modified operations" due to the pandemic.  (Tr. 3.)  But Camilo "has not demonstrated, however, that his lack of access to programming differentiates him from other inmates in federal custody, nor has he presented other factors that would make his confinement uniquely difficult." United States v. Castillo, 03-CR-979 (KMW), 2021 WL 268638, at *4 (S.D.N.Y. Jan. 27, 2021) (citing United States v. Fiseku, 15 Cr. 384-1 (PAE), 2020 WL 7695708, at *4 (S.D.N.Y. Dec. 28, 2020)).  Without "minimiz[ing] the toll exacted by [Camilo's] prolonged separation from his family or his inability to attend to their needs . . . . such circumstances do not differentiate" Camilo from other prisoners.  Fiseku, 2020 WL 7695708, at *4.  "Many incarcerated persons have similar ties—and today are experiencing similar constraints" and Camilo has "not argued that his family is uniquely or especially in need of his presence and support."  Id.

As to Camilo's third argument regarding the alleged unfair treatment of non-citizens, he appears to equate his ineligibility for certain programs and benefits such as "RDAP,

7

halfway house, or most of the First Step Act" with "systemic racism and unfair prejudice against an entire class of people." (Camilo Br. at 5.) As the Court understands and noted at sentencing, Camilo, a non-citizen, is likely subject to removal upon release. The Court recognizes that the "plenary authority of Congress over aliens" is still subject to scrutiny as to "whether Congress has chosen a constitutionally permissible means of implementing that power." I.N.S. v. Chadha, 462 U.S. 919, 941-42 (1983). The Court has "liberally construed" Camilo's pro se filing and interpreted his papers "to raise the strongest arguments that they suggest." United States v. Darling, 10-cr-00640-PAC-2, 2021 WL 2070146, at *2 (S.D.N.Y. May 24, 2021 (citing Erickson v. Pardus, 551 U.S. 89, 94 (2007) and quoting Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006) in the context of a motion for sentence reduction). The motion does not provide a sufficient basis to conclude that Camilo's ineligibility for programs amount to a constitutional deprivation. But apart from complaints about program eligibility, the Court concludes that Camilo's allegations of systemic racism and unfair prejudice are not extraordinary and compelling reasons for reducing his sentence.

As to Camilo's fourth argument regarding his family's suffering, Camilo contends that "[t]he best medicine for Ella is to grant a sentence reduction for her dad, so he can go home and be a real father." (Camilo Br. at 6.) Upon release, Camilo will not likely be at home with his wife and his young daughters Emma and Ella, who appear to live in the Bronx. Camilo appears to acknowledge this in a different section of his motion that "[i]t would be much better for everyone to just send him back to the Dominican Republic now." (Camilo Br. at 5.) Of course, the Court recognizes that being out of custody—albeit more than a thousand miles away in the Dominican Republic—would make it easier for Camilo to communicate with his wife and daughters and for his wife and daughters to visit him in the Dominican Republic (the Court has

not seen anything in the record indicating their desire to uproot and move to the Dominican Republic). But the certainty of deportation here significantly cuts against Camilo's argument. His family's suffering, which the Court accepts as true, is, as Camilo himself notes, "absolutely his fault" (Camilo Br. at 5). It is not an extraordinary and compelling reason for reducing his sentence.

Having reviewed Camilo's arguments as discussed above, the Court concludes that the factors submitted by Camilo, either in isolation or considered together, do not constitute extraordinary and compelling reasons for reducing his sentence. His motion for a sentence reduction will be denied.

ii. Whether the § 3553(a) factors counsel in favor of sentence reduction

Although the lack of extraordinary and compelling reasons for a sentence reduction is sufficient to deny the instant motion, following the Second Circuit's guidance, the Court also notes that the factors under 18 U.S.C. § 3533(a) counsel against a sentence reduction here. See Jones, 17 F.4th at 374.

As to the sentencing factors under 18 U.S.C. § 3553(a), Camilo submits that the "3553(a) factors weigh in favor of release because [he] is a good person," who is an "extraordinary model of correctional reform and transformation" whose "presence makes [prisons] a little less harsh." (Camilo Br. at 6-7.) Specifically, he points to an "absolutely perfect disciplinary record during the almost six years that he has been locked up and he has not been an ounce of trouble." (Id. at 7.) He highlights that he has "programmed, and worked hard as an ESL tutor, helping several prisoners obtain their G.E.D.," and that he has translated for prison staff because he is proficient in both English and Spanish. (Id.) He also argues that he is "not a danger to his community, or to any person," as evidenced by the continued support from

his community, as well as his plans to return to the Dominican Republic and work on his family's farm, get back into the graphic design business, make people happy with his music, and drive for his family's trucking business. (Id.) He also plans to eventually open a restaurant. (Id.)

The Court commends Camilo's efforts at rehabilitation and perfect disciplinary record, which the government does not contest. Camilo's motion also suggests that he has given significant thought to specific post-incarceration plans. Relatedly, the numerous letters from friends and family received by the Court in support of his motion indicate that he continues to possess a support network of people who care about him. These factors count in favor of Camilo in terms of whether incarceration serves to "protect the public from further crimes of the defendant," pursuant to 18 U.S.C. § 3553(a)(2)(C). However, the Court notes that it already determined at sentencing that the "need to protect the public from further crimes of this defendant" had significantly decreased in importance as a sentencing factor here because the Court had been "told that this time, he will certainly be deported from the United States and barred from reentering." (Tr. 30.)

Furthermore, the Court must weigh other relevant factors under section 3553(a), such as the "need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense [and] (B) to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A)-(B). The Court must also consider "the kinds of sentence and the sentencing established" for the applicable offense category and criminal history category, here, yielding a Guidelines range of 121 to 151 months. 18 U.S.C. § 3553(a)(4).

The Court concludes that a further reduction from a 102-month sentence, which was already 19 months below the bottom of the applicable Guidelines range, would not fairly reflect the seriousness of the instant narcotics conspiracy and afford adequate deterrence to criminal conduct, to both Camilo himself and members of the public.

As to the seriousness of the offense, the instant narcotics conspiracy involved 26 kilograms of heroin and 14 kilograms of cocaine, which contributed in part to the substantial applicable Guidelines Range of 121 to 151 months' imprisonment. (PSR ¶ 21.) The "street value" of the 26 kilograms of heroin and 14 kilograms of cocaine was approximately $3 million. (Tr. 24-25.) The substantial amount of narcotics involved in the conspiracy cuts against a sentence reduction. As the Court emphasized at sentencing as to just the quantity of heroin:

> [T]hink of taking 51 pounds of heroin and then using cutting agents, which expands the quantity, and then distributing it at the retail level. How many families are ruined by that? How many children don't have parents or functioning parents because of that heroin and that cocaine?

(Tr. 30.)

As to deterrence to Camilo himself, as both he and the government notes, he had already served a term of incarceration for approximately two years for a similar offense under New York state law for criminal sale of a controlled substance in the second degree, from April 23, 2004 until he was released on parole on May 24, 2006. (PSR ¶ 33.) Furthermore, as the Court noted at sentencing, "a chance was taken on Mr. Camilo, who was deportable because of his conviction for drug selling, and he was let out," instead of being immediately deported from the United States by the immigration authorities." (Tr. 28.) However, in response to what Camilo himself described as a "very fortune opportunity," (Tr. 23) Camilo decided to again engage in criminal narcotics trafficking, many years later as an older man.

11

The Court noted that it has "too much respect for Mr. Camilo . . . to think that he's incapable of thinking through the consequences of his actions, the consequences of the actions would have on his wife and daughters." (Tr. 30.) The Court discussed that perhaps Camilo thought that "[i]f you're caught in 2004, maybe you'll get lucky, and they won't come after you at all to remove you? If he engaged in the transaction, what are the chances of getting caught? Law enforcement—one could easily form the view that law enforcement are not very competent, they're not very good, this will go down. But there's an inherent wrong about it." (Tr. 30.)

Camilo's past record of being undeterred by a previous prison sentence from engaging once more in the sale of narcotics cuts against a sentence reduction here. Relatedly, a further reduction here would inadequately deter other members of the public from engaging in similar criminal conduct. As the Court noted at sentencing, "[t]here is a need to deter others from crimes of this nature, having the message go forth that this is serious business, a $3 million/26-kilogram heroin/14-kilogram cocaine transaction will be severely punished." (Tr. 30.)

In light of the above, the Court concludes that on balance, the applicable factors laid out in 18 U.S.C. § 3553(a) counsel against reducing Camilo's already below-guidelines sentence and would be an alternative and independent ground for denying his motion for sentence reduction.

CONCLUSION

For the reasons explained above, Camilo's motion for a sentence reduction is DENIED. The Clerk of the Court is respectfully directed to terminate the instant motion and mail a copy of this Order to Camilo. (Doc 114.)

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
September 12, 2022